<pre>
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
 2

 3    ------------------------------------------------------------
                                    )
      United States of America,      )   File No. 15-CR-85
 4                                   )              (JRT/BRT)
              Plaintiff,            )
 5                                   )
      v.                             )   St. Paul, Minnesota
 6                                   )   May 6, 2015
      Steven Richard Smasal,         )   10:00 a.m.
 7                                   )
              Defendant.            )
 8    ------------------------------------------------------------

 9               BEFORE THE HONORABLE BECKY THORSON
           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
10                  (CRIMINAL MOTIONS HEARING)

11    APPEARANCES
       For the Plaintiff:        U.S. ATTORNEY'S OFFICE
12                               LAURA PROVINZINO, AUSA
                                 300 S. 4th St., #600
13                               Minneapolis, Minnesota 55415

14     For the Defendant:        WOLD MORRISON LAW
                                 PETER WOLD, ESQ.
15                               AARON MORRISON, ESQ.
                                 247 Third Ave. S.
16                               Minneapolis, Minnesota 55415

17     Court Reporter:           DEBRA K. BEAUVAIS, RPR-CRR
                                 300 S. 4th St., #1005
18                               Minneapolis, Minnesota 55415

19

20

21        Proceedings recorded by mechanical stenography;
      transcript produced by computer.
22

23

24

25
</pre>

1                    I N D E X

2                                                    PAGE

3    S.A. JARED DRENGSON

4        Direct Examination by Ms. Provinzino       9

5        Cross-Examination by Mr. Wold              24

6        Redirect Examination by Ms. Provinzino     33

7    S.A. KEVIN LANG

8        Direct Examination by Ms. Provinzino       35

9

10   GOVERNMENT EXHIBITS:

11   1                                              12

12   2                                              13

13   3                                              13

14   4                                              24

15   5                                              17

16   6                                              47

17

18

19

20

21

22

23

24

25

1          **P R O C E E D I N G S**

2                        **IN OPEN COURT**

3          THE CLERK:  All rise.  United States District

4     Court for the District of Minnesota is now in session, the

5     Honorable Magistrate Judge Becky R. Thorson presiding.

6          THE COURT:  Good morning, everyone.  Please be

7     seated.

8          This is the United States District Court for the

9     District of Minnesota.  We are here today for a motions

10    hearing in the matter entitled, United States of America

11    v. Steven Richard Smasal, Case No. 15-85 (JRT/BRT).

12          Counsel, may I have appearances, beginning with

13    the government.

14          MS. PROVINZINO:  Good morning, Your Honor.  Laura

15    Provinzino on behalf of the United States.  And I'm joined

16    at counsel table by Special Agent Jared Drengson of Homeland

17    Security Investigations and Special Agent Kevin Lang of

18    Homeland Security Investigations.

19          THE COURT:  Good morning.

20          MR. WOLD:  Good morning, Your Honor.  Peter Wold,

21    along with my partner, Aaron Morrison, appearing with

22    Mr. Smasal, who's present at counsel table.

23          THE COURT:  Good morning, Counsel.  And good

24    morning, Mr. Smasal.

25          Now, I have here on calendar discovery motions and

1        some suppression motions.  So why don't we start out with

2        the discovery motions.  First I'll give you the inventory of

3        what I have on the docket, and then we can proceed.

4                I have the government's motion for discovery

5        pursuant to 16(b) 12.1, 12.2, and 12.3, and 26.2.  That is

6        Docket 17.  I have the defendant's motion to retain agent

7        notes.  That's at Docket No. 21.  I have a motion for

8        disclosure of 404(b) evidence at Docket No. 22.  Docket No.

9        23, motion for disclosure of Jencks Act material.  Docket

10       No. 24, motion to compel attorney to disclose *Brady* and

11       *Giglio* material.  And Docket No. 30, that would be the

12       defendant's motion for discovery pursuant to Rule 16.  I

13       have the government's response to the defendant's discovery

14       motions.

15               Maybe I'll first ask, Mr. Wold, if you're

16       satisfied with the government's responses on the discovery

17       motions that I laid out?

18               MR. WOLD:  Your Honor, we're just asking that the

19       government comply with the rules as far as 404(b) and

20       *Brady*/*Giglio* goes.  Obviously, we're not aware under the

21       Jencks Act of statements they have taken, but if any of

22       those are *Brady* or *Giglio* information, then we would expect

23       that to be provided to us forthwith.

24               THE COURT:  All right.  From the government's

25       position.

1          MS. PROVINZINO:  The government concurs.  All

2     information we have has been disclosed.  I have communicated

3     with defense counsel that we are still awaiting some

4     material in response to search warrants and when we actually

5     receive that, that will be available.

6          The only issue that appears to be unresolved would

7     be the timing of the disclosure of Rule 404(b) evidence.

8     The government would submit that 14 days would be more than

9     sufficient, rather than I think the 30 days requested by the

10    defendant.  But, otherwise, the government is aware of its

11    disclosure obligations, has complied and will continue to

12    comply with those.

13          THE COURT:  Thank you.

14          Mr. Wold, is 14 days sufficient for defendant?

15          MR. WOLD:  I'm not sure the Court is familiar with

16    the background of this case, but it involves travel to

17    China, Taiwan, the Philippines.  If we're alerted to 404(b)

18    information that's involved with those countries, with those

19    logistics involved 14 days likely will be problematic.  So I

20    would ask if any of the 404(b) relates to actions overseas

21    that that be provided to us at a minimum 45 days before

22    trial.

23          THE COURT:  From the government, Ms. Provinzino.

24          MS. PROVINZINO:  The government would object to

25    that as just not being reasonable and not being encompassed

1      by the rule.  We certainly understand -- I think to some

2      extent what Mr. Wold may be getting at is information that

3      is really inextricably intertwined with the evidence in this

4      case that does relate to travel for the purposes of sexual

5      contact with children in the Philippines.  We have provided

6      information from overseas sources.  We provided his travel

7      history.  We provided passport information.  We've provided

8      other travel documents, including a law-enforcement contact

9      in the Philippines.  So defendant already has that

10     information available.

11            The government certainly will do everything it can

12     to be prepared and fully allow the defendant that same

13     opportunity to be prepared, as we understand now, an August

14     trial date, but 45 days is not reasonable.  I think the 14

15     days is what's typically done.  I think that would be more

16     than sufficient, even in light of some of the international

17     implications of this case, in large part because that

18     material has already been disclosed.

19            THE COURT:  Thank you, Counsel.

20            Anything further, Mr. Wold, on the 404?

21            MR. WOLD:  Your Honor, this is a CJA appointment.

22     I expect the Court appreciates the difficulty in getting

23     permission and funding to travel overseas in a situation --

24     or in a case like this, and 14 days is just -- it can't

25     happen in that time.

1           Secondly, such travel, unless it's going to be a

2    404(b) situation, is likely or potentially not necessary.  I

3    mean, 14 days is unreasonable in this situation.  You know,

4    maybe 30 could possibly work, but 14 days -- if it's going

5    to be 404(b) evidence that the Court is going to consider

6    allowing into a trial, having notice of it 14 days ahead of

7    time doesn't work, and there would be no doubt a request for

8    a trial continuance.

9           So if the prosecution knows of that evidence or

10   has a feeling for that evidence now, giving us notice 30

11   days ahead of an August trial date isn't unreasonable.  So

12   we would at least ask for that.  And, frankly, 45 days it

13   doesn't make it any more difficult for the government to

14   give us that notice.

15           THE COURT:  All right.  I'll take that under

16   advisement.  Thank you, Counsel.

17           Now we have the government's motion for discovery

18   at Docket 17.  I didn't have a written response from the

19   defendant.  Mr. Wold, anything on the government's motion?

20           MR. WOLD:  No, Your Honor.  When we have anything

21   that is addressed there, we will comply with the rules and

22   provide that.

23           THE COURT:  All right.  Thank you.

24           Let's move on to the suppression motions, unless

25   anyone has anything else on the discovery motions.

1          MS. PROVINZINO:  Nothing further, Your Honor.

2          THE COURT:  Mr. Wold, anything on the discovery

3    motions?

4          MR. WOLD:  No.  No, thank you.

5          THE COURT:  Thank you.

6          On the suppression motions I've got Docket No. 25,

7    motion to suppress search and seizure of items on February

8    24th, 2015; Docket 26, motion to suppress statements from

9    February 24th, 2015; Docket 27, motion to suppression items

10   on October 3rd, 2014; and Docket No. 28, motion to suppress

11   statements from October 3rd, 2014.

12         Counsel, is there any evidence that you wish to

13   present in these motions?

14         MS. PROVINZINO:  Yes, Your Honor.  And as the

15   government indicated in a footnote, we are not relying on

16   any statements made to Homeland Security in Los Angeles

17   pursuant to Docket No. 28, so there will be no testimony on

18   that.  But, otherwise, we're prepared to present testimony

19   on the statements provided by the defendant on February 24th

20   and as it relates to the border searches of digital media

21   both in Los Angeles and here.

22         THE COURT:  All right.  And I have here on the

23   bench several exhibits.  How do you propose proceeding with

24   those?  I assume defendant's counsel, Mr. Wold, has copies

25   of these?

1              MR. WOLD:  We have proposed Exhibits 1 through 6,

2      Your Honor.

3              MS. PROVINZINO:  The government intends, first, to

4      present the testimony of Special Agent Jared Drengson as it

5      relates both to his encounter with the defendant at the

6      Minneapolis-St. Paul Airport and the statements provided,

7      and as to an alternative way to approach the border search

8      authority, which deals with reasonable suspicion.  So those

9      will be the two areas that he will be providing testimony

10     about.

11             THE COURT:  All right.  Thank you.

12             MS. PROVINZINO:  So the United States calls

13     Special Agent Jared Drengson.

14             THE COURT:  Special Agent, if you could step up to

15     the witness box and raise your right hand.

16             (Witness administered oath.)

17             THE COURT:  Thank you.  Could you state your name

18     and your position once you're seated.

19             THE WITNESS:  My name is Special Agent Jared

20     Drengson; J-A-R-E-D, and Drengson is D-R-E-N-G-S-O-N.

21             THE COURT:  You may proceed, Counsel.

22             MS. PROVINZINO:  Thank you.

23

24     **S.A. JARED DRENGSON**

25                         **DIRECT EXAMINATION**

1    **BY MS. PROVINZINO:**

2    Q.  Special Agent Drengson, where do you work?

3    A.  I work for Homeland Security Investigations.

4    Q.  How long have you been with them?

5    A.  Approximately eight years.

6    Q.  And what type of cases do you investigate with Homeland

7    Security?

8    A.  For the past seven years, I've been investigating

9    child-exploitation cases.

10   Q.  And have you been involved with the investigation of the

11   defendant, Steven Richard Smasal?

12   A.  I have.

13   Q.  How did you become involved?

14   A.  Initially, Special Agent Aaron McClellan -- he's a

15   special agent out of Los Angeles -- contacted me in regards

16   to information that he had gotten from Facebook and from the

17   National Center for Exploited and Missing Children in

18   regards to chat logs via Facebook that Mr. Smasal was

19   communicating with under-age children over in the

20   Philippines.

21   Q.  And when did you get contacted by Special Agent

22   McClellan?

23   A.  Approximately, February 23rd of this year.

24   Q.  And you indicated he had provided information to you

25   relating to Facebook chats; is that correct?

1   A.  Yes.

2   Q.  And did he provide other information?

3   A.  He provided -- or, excuse me, he told me that Mr. Smasal

4   had a ticket purchased and was going to be traveling out of

5   Minneapolis Airport en route to Taiwan, I believe, on

6   February 24th.

7   Q.  So in addition to the communication with him, did he

8   present any evidence to you?

9   A.  Yes.  There's also, I believe, two or three images of

10  child pornography that were received by Mr. Smasal via the

11  Facebook chats.

12  Q.  And did you review those images?

13  A.  I did.

14  Q.  And are you familiar with the federal definition of

15  child pornography?

16  A.  I am.

17  Q.  And was your review of those images consistent with

18  child pornography?

19  A.  Yes, I believe two out of the three.

20          MS. PROVINZINO:  May I approach, Your Honor?

21          THE COURT:  You may.

22  BY MS. PROVINZINO:

23  Q.  So, Special Agent Drengson, I'm handing you what has

24  been premarked as Government Exhibits 1 through 4.

25          I will start with Exhibit 1.  Do you recognize

1    that exhibit?

2    A.  I do.

3    Q.  And what is that?

4    A.  These are Facebook chats provided to me from Agent

5    McClellan via Facebook.

6    Q.  And when did you receive that exhibit?

7    A.  I believe on February 23rd.

8             MS. PROVINZINO:  The government moves the

9    admission of Government Exhibit 1.

10            MR. WOLD:  No objection.

11            THE COURT:  Exhibit 1 is admitted.

12   BY MS. PROVINZINO:

13   Q.  Now, do you have Government Exhibits 2 and 3 in front of

14   you?

15   A.  I do.

16   Q.  And what are those?

17   A.  These are reports from the National Center For Missing

18   and Exploited Children, again, first given to Special Agent

19   McClellan and then given to me.

20   Q.  And when did you receive those exhibits?

21   A.  Also, again, on February 23rd.

22   Q.  Are those in the same, or substantially the same,

23   condition as when you received them?

24   A.  Yes, they are.

25            MS. PROVINZINO:  The government moves the

1    admission of Exhibits 2 and 3.

2         MR. WOLD:  No objection.

3         THE COURT:  Exhibits 2 and 3 are admitted.

4    BY MS. PROVINZINO:

5    Q.  Special Agent Drengson, what is a NCMEC tip?

6    A.  A NCMEC tip is either an individual or a company reports

7    something to the National Center for Exploited and Missing

8    Children involving some type of child abuse, child sexual

9    abuse.  It's usually something to do with a child in harm's

10   way.

11   Q.  And then what happens with the tip?

12   A.  NCMEC usually does a type of a work-up to try and figure

13   out where the victim may be or the offender and then contact

14   that agency to go in, investigate.

15   Q.  Now, you said prior to your encounter with the

16   defendant, you had spoken with Special Agent McClellan; is

17   that correct?

18   A.  Yes.

19   Q.  And had he encountered the defendant before?

20   A.  He had.

21   Q.  And what did he learn from that encounter?

22   A.  I believe it was on October 3rd of 2014.  Mr. Smasal was

23   entering Los Angeles Airport via the Philippines and during

24   a secondary examination, Mr. Smasal was interviewed by

25   agents there, and also his laptop was examined -- or I guess

1    it was previewed at the airport.

2    Q.  Did he make any statements about child pornography?

3    A.  Yes, he did.

4    Q.  And what were those?

5    A.  That there would be some images and videos of child

6    pornography on the laptop.

7    Q.  And did Homeland Security Investigations in LA find such

8    images?

9    A.  Yes, they did.

10   Q.  And those were a few of the images that you, yourself,

11   had reviewed; is that correct?

12   A.  That is correct.

13   Q.  Now, what other information did you know about the

14   defendant before you encountered him at the Minneapolis-St.

15   Paul Airport?

16   A.  Special Agent McClellan informed me again that he was

17   going to be traveling from Minneapolis to Taiwan.  And,

18   also, I was able to ascertain that Mr. Smasal was

19   approximately 46 years of age.  He primarily resided in the

20   United States, in Wisconsin.  He had a quite extensive

21   travel history as far as international.

22   Q.  And some of that travel history related to his

23   occupation; is that right?

24   A.  Yes.  I believe Mr. Smasal is a teacher, and he teaches

25   English as a secondary language overseas.

1    Q.  So based on the alert or the information you had

2    received from Special Agent McClellan, was there a

3    determination that Mr. Smasal would also go through a

4    secondary examination in Minneapolis-St. Paul?

5    A.  Yes.

6    Q.  And what is a secondary examination?

7    A.  A secondary examination is either performed by Customs

8    and Border Protection officers or by special agents, and it

9    is to question further beyond the regular questions of where

10   you're going, who you are.

11   Q.  And so where did you then encounter Mr. Smasal?

12   A.  At the Minneapolis Airport in the secondary area where

13   they were examining his luggage.

14   Q.  And were you with anyone?

15   A.  Yes.  I was with Special Agent Tabolich of Homeland

16   Security Investigations.

17   Q.  Who is he?

18   A.  He's a special agent that is primarily assigned to the

19   airport in Minneapolis.

20   Q.  And what were you and Special Agent Tabolich wearing?

21   A.  We were in plain clothes.

22   Q.  And what did you do then when you and Special Agent

23   Tabolich met with Mr. Smasal?

24   A.  We introduced ourselves as special agents and showed

25   Mr. Smasal our credentials.

1    Q.  And where was he when you introduced yourself to him?

2    A.  He was in what we call the federal inspection area.

3    It's, basically, a huge room, like auditorium style, where

4    all the passengers come through off the planes and where

5    they're sent to a secondary inspection area.  He was seated

6    at, like, a cardboard-type table with chairs.

7    Q.  When you encountered Mr. Smasal, did you do anything to

8    further search for contraband?

9    A.  Yes.  Myself and S.A. Tabolich brought Mr. Smasal into a

10   room to perform a secondary patdown.

11   Q.  And was it your intent at that point in time to

12   interview Mr. Smasal?

13   A.  Yes.

14   Q.  And when you encountered him, what did you tell him

15   about that interest in interviewing him?

16   A.  We initially told Mr. Smasal that his computers and

17   phones were being searched by our forensic agents, and that

18   we wished to speak with him concerning why we were doing

19   that examination.

20   Q.  Was he under arrest?

21   A.  He was not.

22   Q.  Was he given any information about whether he would be

23   under arrest?

24   A.  Yes.  He was informed that he was not under arrest, that

25   the interview would be voluntary.  And also I read him his

1    *Miranda* warnings, and after I read them to him provided him

2    the sheet that had the warnings on them.  He read them.  I

3    asked Mr. Smasal if he understood the warnings.  He stated,

4    "Yes," and he wanted to continue the interview.

5    Q.  Now, Special Agent Drengson, you just talked about a

6    sheet that you used with Mr. Smasal.

7           MS. PROVINZINO:  May I approach with Government

8    Exhibit 5?

9           THE COURT:  You may.

10   BY MS. PROVINZINO:

11   Q.  I'm handing you what's been premarked for identification

12   purposes as Government Exhibit 5.  Do you recognize that

13   exhibit?

14   A.  Yes, I do.

15   Q.  Is that the sheet you were just referring to?

16   A.  It is.

17   Q.  Is that, in fact, your signature on it?

18   A.  Yes.

19           MS. PROVINZINO:  The government moves for

20   admission of Government Exhibit 5.

21           MR. WOLD:  No objection.

22           THE COURT:  The government's Exhibit 5 is

23   admitted.

24   BY MS. PROVINZINO:

25   Q.  So could you walk the Court through the process that you

1   and Special Agent Tabolich took then prior to the interview

2   with Mr. Smasal as it relates to the review of his rights.

3   A.   Again, I read Mr. Smasal our *Miranda* warnings, handed

4   the sheet to him for him to read.  After he was finished, I

5   asked Mr. Smasal if he understood these warnings, he stated

6   he did, and he wanted to continue the interview.  I said, If

7   that's so, you need to sign the form.  And myself and

8   Special Agent Tabolich also signed the form.

9   Q.   And can you describe then how the interview took place.

10  A.   It lasted, approximately, an hour and 20 minutes.  The

11  first portion of the interview was to ascertain the

12  background information on Mr. Smasal:  where he grew up,

13  age, address, his occupation, those type of questions.  And

14  then after that, we went into the reason why his laptops

15  were being searched.

16  Q.   And what was the reason for that search?

17  A.   Based off the information we received from Facebook

18  concerning the chats with under-age girls.

19  Q.   Now, did you or Special Agent Tabolich raise your voices

20  during this encounter with Mr. Smasal?

21  A.   No.

22  Q.   Did you make any promises to him?

23  A.   No.

24  Q.   Did you make any threats to Mr. Smasal to get him to

25  speak with you?

1    A.  No.

2    Q.  Was a weapon brandished by you or Special Agent

3    Tabolich?

4    A.  No.

5    Q.  In your interview -- you indicated it took over an hour,

6    hour and 20 minutes, approximately -- was Mr. Smasal able to

7    speak and understand the questions -- speak and understand

8    English and the questions that were being presented to him?

9    A.  He was.

10   Q.  And did he appear to appropriately respond to the

11   questions that you were presenting to him?

12   A.  Yes.

13   Q.  Now, in your experience with law enforcement, have you

14   encountered people who have been under the influence of

15   drugs or alcohol?

16   A.  I have.

17   Q.  And did you observe any signs of intoxication with

18   Mr. Smasal during the encounter at the airport?

19   A.  No.

20   Q.  During that interview, did Mr. Smasal ask any questions

21   of you?

22   A.  He asked a few concerning his laptop and his phone, if

23   he would be able to get those back.  And I stated to him

24   that it would depend on what was found on those items.

25   Q.  You are talking about what was found on those items.

1    Did you in fact then talk to Mr. Smasal about information on

2    his cell phone or laptop?

3    A.  Yes.  Towards the end of the interview, I went back to

4    where our agent, Kevin, was -- Lang, and Mr. Lang showed me

5    some Skype chat logs found on Mr. Smasal's phone, and those

6    chat logs were the same ones -- or the same type of chat

7    logs, as far as talking with under-age girls overseas.  I

8    brought that phone and showed it to Mr. Smasal and he stated

9    that, yes, he was the one that did those logs.

10   Q.  Now, the focus of these initial questions were whether

11   the waiver of Mr. Smasal's rights under *Miranda* was knowing

12   and voluntary.  But you understand there's a separate issue

13   relating to the forensic analysis of the cell phone and the

14   laptop and whether there was reasonable suspicion for that?

15   Do you understand that?

16   A.  Yes.

17   Q.  So I'm going to ask you a few questions about that.

18   A.  Okay.

19   Q.  Now, you earlier testified about the NCMEC tips and the

20   information that law enforcement received from Facebook that

21   both you and Homeland Security in Los Angeles had received

22   and reviewed; is that correct?

23   A.  Yes.

24   Q.  And those relate to Government Exhibits 1 through 3?

25   A.  Yes.  Correct.

1    Q.  Now, in the course of the interview with Mr. Smasal, did

2    he confirm information that was consistent with information

3    provided by Facebook and in the NCMEC tips?

4    A.  Yes, he did.  And he stated that a lot of those chats

5    were created when he was intoxicated.

6    Q.  So he confirmed in relation to those chats that he had

7    produced them; is that right?

8    A.  Yes.

9    Q.  He also confirmed that he had been living and teaching

10   abroad; is that correct?

11   A.  Correct.

12   Q.  And you knew that he had extensive travel history in

13   Taiwan and the Philippines; is that correct?

14   A.  Yes.  Correct.

15   Q.  And he also had talked to you about some encounters he

16   had with law enforcement?

17   A.  Yes.

18   Q.  What did he tell you about that during the interview?

19   A.  He stated that he was over in the Philippines and there

20   was a woman over there that he knew, I'm not sure exactly

21   how, but that he had some property that was stolen from him

22   out of his hotel room by her.  He stated that she said that

23   she would give it back to him if he -- she was making claims

24   that he was having inappropriate contact with children over

25   in the Philippines and that that was the reason why she took

1    it.

2    Q.  Now, over the course of the interview, did you ask him

3    about account information he had?

4    A.  Yes.  I asked him about user names and passwords, and he

5    provided some that were consistent with the information we

6    had from NCMEC.

7    Q.  And did you ask him about his use of social media?

8    A.  Yes.

9    Q.  And what did he tell you about that?

10   A.  He used Facebook, Skype, and e-mailing.

11   Q.  Now, as your interview was taking place, you indicated

12   that Special Agent Kevin Lang was reviewing Mr. Smasal's

13   laptop and cell phone; is that correct?

14   A.  Yes.

15   Q.  Did Mr. Smasal tell you when he had obtained that laptop

16   and cell phone?

17   A.  I believe it was in October of 2014.

18   Q.  And you talked about having occasion to show Mr. Smasal

19   those Skype chats; is that correct?

20   A.  Yes.

21   Q.  Now, over the course of that interview, did Mr. Smasal

22   ever ask to speak with an attorney?

23   A.  No.

24   Q.  Did he ever indicate he would not answer a certain

25   question?

1    A.  No.

2    Q.  Or that he wanted to remain silent?

3    A.  No.

4    Q.  Did he ask for the questioning to stop?

5    A.  No.

6    Q.  And how did the interview end?

7    A.  The interview ended and I explained to Mr. Smasal that

8    we would be seizing his phone and laptop based off of the

9    chat log that we found on there and informed him that he was

10   still free to leave.  We realized that the flight that he

11   was previously on was not going to be made due to the

12   interview, so we directed him to the area where he could go

13   and rebook a flight.

14   Q.  Now, Special Agent Drengson, you had an opportunity then

15   to review the cell phone later that evening; is that

16   correct?

17   A.  Not later that evening.  Probably that following day

18   maybe.

19   Q.  And did you use that information then as a basis for

20   your affidavit for the arrest warrant and complaint?

21   A.  Yes.

22   Q.  And do you see Government Exhibit 4 in front of you?

23   A.  Yes, I do.

24   Q.  And that's in fact your arrest warrant, and the

25   complaint, and the affidavit; is that correct?

```
 1    A.  It is.

 2            MS. PROVINZINO:  The government moves for

 3    admission of Government Exhibit 4, which I believe is

 4    already part of the record, but --

 5            MR. WOLD:  No objection.

 6            THE COURT:  Exhibit 4 is admitted.

 7            MS. PROVINZINO:  No further questions at this

 8    time.

 9            THE COURT:  Mr. Wold.

10            MR. WOLD:  Thank you.

11

12                      CROSS-EXAMINATION

13    BY MR. WOLD:

14    Q.  Good morning, Agent Drengson.  Is that correct?

15    A.  Yes, sir.

16    Q.  You received information from your counterpart in LA on

17    February 23rd?  Is that your recollection?

18    A.  Yes.

19    Q.  Okay.  And you had a conversation with him that day?

20    A.  Yes.

21    Q.  And where were you when you had that conversation?

22    A.  In my office.

23    Q.  And that is?

24    A.  At Fort Snelling.

25    Q.  Okay.  And how long was that conversation with -- I'm
```

1    missing -- McClellan?

2    A.  Yes, Aaron McClellan.

3    Q.  Okay.  And how long was that conversation, sir?

4    A.  There was more than one conversation.  I know that

5    Mr. McClellan was in contact with another agent, the one

6    that previously I spoke about at the airport, S.A. Tabolich.

7    And then I kind of got onboard as these were some of the

8    cases that I work.  So, I mean, I guess in total between

9    myself and Mr. Tabolich, with Aaron, there's probably

10   upwards of ten conversations.

11   Q.  Okay.  And at that point, you were advised that -- I

12   believe the information was that Mr. Smasal had a

13   reservation to travel abroad coming up within the next day

14   or two?

15   A.  Yes.  Correct.

16   Q.  And were you given the exact flight information and that

17   sort of thing, sir?

18   A.  Yes.

19   Q.  And did you verify that?

20   A.  Yes.

21   Q.  And how do you go about verifying that, being an

22   inspector of Homeland Security?

23   A.  Myself personally did I verify it?  No.  It would be,

24   again, S.A. Jesse Tabolich.  He works at the airport and he

25   has contacts at the airport through certain airlines that

1    can confirm.

2    Q.  Okay.  So, basically, through the cooperation with

3    airlines and booking agents and so forth, you are able to

4    gather information about a subject's flight history and

5    flight reservations; is that fair?

6    A.  Flight history not so much.  Just if they in fact

7    purchased that ticket and if they had checked in is usually

8    what we ask them.

9    Q.  Okay.  So this is February 23rd.  What was the date and

10   time of the flight?

11   A.  The date I know was February 24th.  I cannot recall the

12   exact time of the flight.

13   Q.  And what time on the 23rd did you receive the call from

14   your fellow agent in LA?

15   A.  I can't recall.  Just some time on that day.

16   Q.  Okay.  Did you work on that investigation throughout

17   that day and prepare for the encounter on the 24th?

18   A.  Yes.

19   Q.  Okay.  And what did you do, besides verify that he was

20   indeed scheduled to fly out the next day?

21   A.  Reviewed all the information that S.A. McClellan

22   provided me concerning the chat logs, and then did some of

23   my own background work to find out who Mr. Smasal was, if he

24   had a criminal history, whatnot, his travel history, and so

25   forth.

1    Q.  Okay.  And how did you determine travel history he had?

2    A.  We have a law-enforcement tool, it's our computer

3    system, where we can enter an individual's name and some

4    other identifiers and it will pull up international travel

5    history.

6    Q.  And what did you find when you pulled up Mr. Smasal's

7    international travel history, sir?

8    A.  That he was an extensive international traveler.

9    Q.  Okay.  You reviewed the information provided that I

10   think were Exhibits 1 through 3; is that correct?

11   A.  Yes.

12   Q.  That was the total of the, I guess, written information

13   provided to you from LA; is that correct?

14   A.  Yes.

15   Q.  Okay.  And from that you had, at least it seems in

16   Exhibit 1, the Facebook reports of their assessment of his

17   different Facebook accounts; is that correct?

18   A.  Yes.  Correct.

19   Q.  And part of those included chats with, apparently,

20   individuals in the Philippines; is that true?

21   A.  Yes.

22   Q.  And other than the Philippines, did you see any other

23   chats with individuals from other countries?

24   A.  No.

25   Q.  And, in fact, it was those chats with the individuals in

1    the Philippines that raised your suspicions; is that

2    correct?

3    A.  Yes.

4    Q.  And they were purportedly between an individual that

5    Facebook represented as being connected with Mr. Smasal and

6    individuals that in one way or another suggested they may be

7    16 years old or less; is that fair?

8    A.  Yes.  There was more than one account for Mr. Smasal or

9    at least that's what they reported to us.

10   Q.  So with that information and the background you did, you

11   went to the airport and just based on your experience had an

12   idea where Mr. Smasal would be showing up?

13   A.  Yeah.  Anybody that flies international has to go

14   through a certain checkpoint.

15   Q.  Okay.  Maybe I'm just not familiar with it, but you

16   called it a "secondary area"; is that right?

17   A.  Yes.  That's where I encountered him at.  Yes.

18   Q.  And tell us what a "secondary area" is.

19   A.  "Secondary area" would be, I guess, if you and me were

20   flying and after they examine your passport and they want to

21   ask you further questions or check your luggage, they send

22   you to a secondary area.

23         So the first area where they are talking to you

24   and look at your passport is like a primary inspection.  And

25   if there is deemed to be further questions, they send them

1    to a secondary area to not impede the other people behind

2    you.

3    Q.   Okay.  So fair to say the majority of the folks go

4    through the primary area and go on their way?

5    A.   Yes.

6    Q.   So you expected to find him in the secondary area

7    because you had alerted people at the primary area to divert

8    Mr. Smasal; is that right?

9    A.   Yes.

10   Q.   And what did you tell them, and who did you talk to to

11   create that situation?

12   A.   It was, again, myself and S.A. Tabolich as he is an

13   agent at the airport.  So I'm sure that Tabolich informed

14   CBP that we're going to be coming out there on the 24th.  We

15   gave them the name of the guy and stuff we wanted to talk

16   to, so they helped us streamline things.

17   Q.   Okay.  So the people at the passport desk in the primary

18   area are looking for that name?

19   A.   Sure.  Yes.

20   Q.   And when they do whatever they tell them, they say

21   you've got to go over here?

22   A.   Correct.

23   Q.   Okay.  And were you there when he was sent over there or

24   did you show up after he was in the secondary area?

25   A.   I showed up afterwards.

1    Q.  Okay.  I have had the opportunity to read some of the

2    reports done by you or other agents, but it seems like you

3    do a more superficial process when you question the subject

4    in the secondary area and then you move them to more of a

5    private room to do an interrogation.

6    A.  Not in this -- no.  I mean, everything was conducted --

7    the interview was conducted in the secondary area.  There

8    was no -- we were not in -- the area that we were in was --

9    the size of the room is, like, an auditorium-style room.  We

10   were just at a table.

11   Q.  So the hour and 20 minutes of questioning just happened

12   in a room where other people were coming and going?

13   A.  Yes.

14   Q.  Okay.  And as I understand it, you first got some

15   background.  You verified his travel information.  Is that

16   right?  Did you look at his ticket and that sort of thing?

17   A.  I don't believe we looked at his ticket.  I believe the

18   CBP officers had that.

19   Q.  Okay.  And you had his itinerary; is that right?

20   A.  Yes.  Correct.

21   Q.  And tell us what that itinerary suggested.

22   A.  I believe it was flying from Minneapolis to Taiwan.

23   Q.  Okay.  Well, I mean, you verified that?

24   A.  I verified it.  I can't remember if it was Taiwan or

25   China.  Yeah.

1    Q.  Any other future itinerary that was booked in any

2    airlines in his name that you discovered?

3    A.  I don't believe so.  No.

4    Q.  Okay.  There was absolutely no itinerary or flights

5    booked to go to the Philippines?

6    A.  No.

7    Q.  There were not, correct?

8    A.  Correct.

9    Q.  Okay.  As I understand your direct testimony, while you

10   were seated with Mr. Smasal -- do you recognize Mr. Smasal?

11   A.  I do.

12   Q.  You do.

13              While you were seated with Mr. Smasal, you

14   initially told him that his computer and phones were already

15   in your custody and being examined for their contents?

16   A.  Correct.

17   Q.  Okay.  I mean, this wasn't a situation where ahead of

18   time you asked him for his permission to do that or anything

19   like that?

20   A.  No.

21   Q.  You advised him that they were in fact being searched

22   during the course of the period you were discussing his

23   background and so forth?

24   A.  Yes.

25   Q.  Okay.  And you had his phone?

1    A.   I personally did not have it, but, yes.

2    Q.   One of the other agents had it, and that was one of the

3    things being examined?

4    A.   Correct.

5    Q.   You told him that?

6    A.   Correct.

7    Q.   So if he wanted to call a lawyer or anyone else, he

8    didn't have a phone at that table?

9    A.   No.  But if he wanted to contact an attorney, we would

10   have made one available.

11   Q.   Okay.  After you told him that you had his -- how had

12   you come to be in possession of his phone and computer when

13   you first sat down with him?

14   A.   How did I become in possession of it?

15   Q.   You or your fellow agent had his phone at the point you

16   sat down with him?

17   A.   It was initially detained by CBP, by Customs and Border

18   Protection officers.

19   Q.   Is that the primary?

20   A.   That's the officers that work at the airport.

21   Q.   Okay.  So before he was met by you, they already had his

22   phone and computer and were preparing to go through it, if

23   not already going through it?

24   A.   Yes.  Correct.

25   Q.   Okay.

1          MR. WOLD:  Thank you.  I don't have any other

2   questions.

3          THE WITNESS:  Thank you.

4          THE COURT:  Ms. Provinzino.

5

6                   **REDIRECT EXAMINATION**

7   **BY MS. PROVINZINO:**

8   Q.  I want to call your attention to Government Exhibit 1

9   and on what's been Bates labeled page 218.  Do you have that

10  one in front of you?

11  A.  Yes.

12  Q.  Now, that was information that you had and you'd

13  reviewed prior to meeting with Mr. Smasal at the airport; is

14  that correct?

15  A.  That's correct.

16  Q.  Is that a fair and accurate photo of him?

17  A.  Yes, it is.

18  Q.  Then there's a list of numerous recent IP addresses for

19  both Steven Smasal and Sam Hurtz.  Do you see that?

20  A.  Yes.

21  Q.  And what countries are listed for those IP addresses?

22  A.  It appears they are all in the Philippines with an

23  exception of two of them from Taiwan.

24  Q.  And that was also the information that you had relating

25  to Facebook identifications of Mr. Smasal; is that correct?

1    A.  That is correct.

2    Q.  And e-mail addresses, both legitimate and what have been

3    deemed to be fake, in this law-enforcement bulletin?

4    A.  Yes.  I don't believe the e-mails were considered

5    "fake."  It was the Facebook accounts themselves were

6    considered "fake."

7    Q.  And since that time have you learned of other Facebook

8    accounts associated with Mr. Smasal?

9    A.  Yes.

10   Q.  And are you in the process of obtaining that

11   information?

12   A.  Yes.

13              MS. PROVINZINO:  No further questions.

14              THE COURT:  Ms. Provinzino, I have Exhibit 6.

15   Will that be used with another witness?

16              MS. PROVINZINO:  Yes, Your Honor.

17              THE COURT:  All right.

18              Thank you, Special Agent.

19              Do you have any further questions, Mr. Wold?

20   Sorry, I should ask.

21              MR. WOLD:  No.

22              THE COURT:  All right.  Thank you.

23              MS. PROVINZINO:  The United States calls Special

24   Agent Kevin Lang.

25              THE COURT:  Special Agent Lang, if you could step

1      up to the witness box and raise your right hand.

2                (Witness administered oath.)

3                THE COURT:  Thank you.  As you're settled in there

4      if you could give us your name and spell your name for the

5      record, please.

6                THE WITNESS:  Special Agent Kevin Lang; K-E-V-I-N,

7      L-A-N-G.

8                THE COURT:  Thank you.

9                You may proceed, Counsel.

10               MS. PROVINZINO:  Thank you.

11

12     **S.A. KEVIN LANG**

13                        **DIRECT EXAMINATION**

14     **BY MS. PROVINZINO:**

15     Q.  Special Agent Lang, how are you employed?

16     A.  With Homeland Security Investigations.

17     Q.  And how long have you been with them?

18     A.  I've been an agent with them since 2003.

19     Q.  And in addition to being an agent, do you play any other

20     roles in Homeland Security Investigations?

21     A.  I'm a computer forensic agent.

22     Q.  And when did you complete your certification for that?

23     A.  Started training for that in 2005, so by 2006.

24     Q.  Have you been involved in reviewing the digital media

25     associated with the defendant, Steven Richard Smasal?

1    A.   I have.

2    Q.   And when did your involvement begin?

3    A.   The morning of February 24th.

4    Q.   And where did it begin for you?

5    A.   At the Minneapolis Airport.

6    Q.   And what part of the airport were you in?

7    A.   The Federal Inspections area.

8    Q.   And what items did you then have to review?

9    A.   There was a laptop, a cell phone, and I believe a couple

10   of thumb drives.

11   Q.   Had there been a search of any of the items before you

12   became involved?

13   A.   It's my understanding that the laptop was booted up by

14   one of the CBP officers and they did a quick preview.

15   Q.   Then when they came to you, what did you do?  Let's talk

16   about the laptop first.  What did you do at the airport

17   relating to the defendant's laptop?

18   A.   When I received the laptop, I attempted to boot it using

19   a Linux Bootdisk that would prevent any rights to the

20   Windows operating system.

21   Q.   Were you able to do that?

22   A.   Eventually.  It booted at least once to the desktop, so

23   I pulled the plug, shut it down and got it to boot to the

24   Linux Bootdisk.

25   Q.   And why did you want to use the Linux Bootdisk?

1  A.  Using a Linux Bootdisk would prevent any changes to the

2  Windows system because it will not write to the file system

3  on that computer.

4  Q.  You were then able to get into the laptop; is that

5  correct?

6  A.  Yes.

7  Q.  And did you see a user profile?

8  A.  Yes.

9  Q.  And what information was in the user profile?

10  A.  I believe the user name was "Steven," and what I did was

11  I searched for pictures and images or videos under that user

12  profile, concentrated primarily on the user profile.

13  Q.  What did you learn in that review where you were looking

14  for images or pictures?

15  A.  Did not find anything of evidentiary value.

16  Q.  So when you say that, does that mean something

17  consistent with child pornography?

18  A.  Correct.

19  Q.  Now, how about the cell phone?

20  A.  When I received the cell phone, I put it in airplane

21  mode.  That prevents it from connecting to the towers and

22  receiving phone calls or chats or text messages, similar to

23  a laptop.

24  Q.  Okay.  And so when the cell phone was in airplane mode,

25  what did you do with it?

1    A.  I browsed it manually in my hand and just looked at -- I

2    believe went right to -- looked at the Skype chat log or the

3    Skype application.

4    Q.  And what did you see in looking at the Skype

5    application?

6    A.  I found several chats that appeared to be the person

7    using the phone chatting with a female by the name -- or

8    someone in the Philippines by the name.  There were some

9    other indicators.  Sounded like they were talking about

10   their daughter or meeting their daughter.

11   Q.  Okay.  Now, to go over this period of time, how long did

12   you do that preview of the laptop and the cell phone?  How

13   much time did it take?

14   A.  Forty minutes to an hour maybe.

15   Q.  Now, was the review considered to be a manual search?

16   A.  Yeah.

17   Q.  Or how would you describe it?

18   A.  It's a preview, just manually searching the device as

19   the device presents itself.

20   Q.  Were you using any forensic search tools?

21   A.  Not at that time.

22   Q.  Did you review anything in what's known as delete or

23   unallocated space?

24   A.  No.

25   Q.  How about the cloud?

1    A.   No.

2    Q.   So the only information you looked at was just what one

3    could physically see if they were using that cell phone

4    themselves?

5    A.   Correct.

6    Q.   And, similarly, would that be the case with the laptop?

7    A.   Correct.

8    Q.   And was there any extraction of information performed

9    during that less than an hour you were with the data at the

10   airport?

11   A.   No.

12   Q.   So you said you found these Skype chats.

13   A.   Correct.

14   Q.   What did you do with that information?

15   A.   Alerted the case agent.

16   Q.   Then at that point in time, after that initial preview

17   and the alert of the case agent, was a determination made

18   that the laptop and phone would be detained for a further

19   search?

20   A.   Yes.

21   Q.   What type of search would that be?

22   A.   That would be an extensive forensic examination.

23   Q.   And what does that mean?

24   A.   We would take the items back to our office at the

25   Whipple Building on Fort Snelling.  We would image the

1    laptop.  So I pulled the hard drive out of the laptop,

2    connected it to a write blocker and then made a forensic

3    copy, byte by byte copy, of the entire hard drive.

4         The cell phone was similarly examined with the

5    software known as CelleBrite, also pretty much made a

6    physical copy is what the forensic examiner with the phone

7    told me, he made a physical copy, copied his entire cell

8    phone.

9    Q.  So let's talk about that laptop first.  You said you

10   have to do an image copy?

11   A.  Yes.

12   Q.  How do you do that?

13   A.  Connecting it through a write blocker, which prevents

14   any changes to the hard drive so my system will not touch

15   the hard drive, made a copy of that laptop was put back

16   together, put off to the side and we work from the copy.

17   Q.  And when did you begin the imaging process?

18   A.  That morning.

19   Q.  So when you say "that morning," we're on February 24th?

20   A.  February 24th, probably mid-morning, approximately.

21   Q.  How long does that process take?

22   A.  The hard drive was 750 gigabytes, so I probably let it

23   run the whole evening.  I can't exactly remember when I shut

24   it down.  I would have to look at the logs.

25   Q.  So imaging is the first step?

1    A.   Yes.

2    Q.   Did you do anything to confirm that it was properly

3    imaged?

4    A.   Yes.  What's called the hashes -- it's a numerical

5    number as the data is coming across the wire, mathematic

6    algorithm just compares what was read to what's on the hard

7    drive, and my copy matched the hard drive.

8    Q.   Then after the image copy was made and you confirmed

9    that, did you use any forensic software for your review?

10   A.   Yes, I did.

11   Q.   And what did you use?

12   A.   Two of the tools I primarily used here was X-Ways,

13   commercially-available software, I believe it's out of

14   Germany; and IEF, Internet Evidence Finder.

15   Q.   Is that also a commercially-available software?

16   A.   Yes, it is.

17   Q.   So what did you then do with the use of X-Ways and IEF?

18   A.   X-Ways looked for images and videos in allocated and

19   unallocated space, so it's also searching deleted files or

20   files that have been previously deleted.  That came up

21   negative.  There was no child pornography found on the

22   laptop anywhere.

23        I searched for recent folders, what files might

24   have been looked at, because if they are deleted and not

25   found there still might be a link of a file suggesting child

1   pornography; did not find anything there.  I'm trying to

2   think of what else I examined.

3   Q.  Through the use of Internet Evidence Finder, did you

4   look for any key search terms or find anything that was

5   relevant to the investigation?

6   A.  Evidence Finder looked at the Google search history for

7   Internet Explorer and there were several hundred, if not

8   thousands, of hits of various searches of everything.  A

9   couple that were of interest appeared to be searches for the

10  term "runaway" or "child" and stuff like that, as I wrote in

11  my report.

12  Q.  When you look through Internet Evidence Finder for those

13  search terms, does that have to be a search term that the

14  user himself enters?

15  A.  Yes.

16  Q.  So you found some search terms that had evidentiary

17  significance.  Did you find any evidence of use of social

18  media?

19  A.  Yes.  There was significant Skype chat logs that were

20  also recorded on the laptop.

21  Q.  Now, were those similar to what was found on the cell

22  phone?

23  A.  Yes, very similar, if not the same.

24  Q.  Now, how long did your forensic review take?

25  A.  About two weeks.

1    Q.  And is that a continuous process?

2    A.  Yes.

3    Q.  So to kind of break that down, you said you got to the

4    airport initially on the 24th in the morning?

5    A.  Correct.

6    Q.  And did just an initial preview there?

7    A.  Correct.

8    Q.  And then a determination was made, based on information

9    found, to do a forensic examination?

10   A.  Yes.

11   Q.  So the first step was the imaging?

12   A.  Correct.

13   Q.  And then after that the use of -- how long does it take

14   to use Internet Evidence Finder or the X-Ways forensic

15   software?

16   A.  So then that would probably be the next day started

17   working on that, so somewhere around eight to ten days

18   probably working on that stuff alone, you know, various

19   searches, talking to the case agent, any other searches he

20   can think of, you know, stuff like that.

21   Q.  So a continuous process through the completion of your

22   exam.  And how do you finish or complete an exam?

23   A.  And then once we determine that there really is nothing

24   else that I can find or it appears to be we've hit the end,

25   then I would pull all the data together, all the stuff that

 1    I pulled off the hard drive, that would be burned to a disk,

 2    and then a report is written and that stuff is given to the

 3    case agent.

 4    Q.  And you have a report that you have created in this case

 5    that was finalized on March 10th, is that correct -- or

 6    approved on March 10th?

 7    A.  Correct.

 8    Q.  So let's talk about the cell phone.  It's a Galaxy

 9    Centura cell phone; is that correct?

10    A.  Yes.

11    Q.  And how was that reviewed?

12    A.  That was reviewed using CelleBrite software.  They make

13    hand-held cell phone extraction tools in a software

14    extraction tool.  So the phone is connected to a computer

15    that's running the software and then it pulls the data off

16    the phone.

17    Q.  And when did that CelleBrite review take place?

18    A.  I believe it was that day.

19    Q.  And how long does that take?

20    A.  This particular phone took approximately 10 to 15

21    minutes to complete.

22    Q.  And when you talk about that being a cell phone data

23    extraction, is that just a physical dump of the material?

24    A.  This particular -- you can do a logical or physical.

25    This phone the forensic agent did a physical.  So he pulled

1    all the data off.  This would also obtain deleted data.

2    Q.  Did you or your colleague do anything to ensure it was a

3    forensically sound copy at the time?

4    A.  As forensically sound as a cell phone extraction tool

5    can be done, yes.

6    Q.  And in that extraction did you access anything on the

7    cloud?

8    A.  No.  The phone was in airplane mode.

9    Q.  Or any remote data?

10   A.  No.

11   Q.  So the only information obtained was that on the cell

12   phone itself?

13   A.  What is on the phone.

14   Q.  And then what did you do with the physical dump or the

15   extraction of that information?

16   A.  That information was burned to a disk and given to the

17   case agent.

18   Q.  Where were you able to locate the Skype chats?

19   A.  Skype chats were found on the phone and in the user

20   profile on the laptop.

21   Q.  Now, are you aware that another laptop had earlier been

22   detained at the Los Angeles Airport?

23   A.  Yes.

24   Q.  And when did that occur?

25   A.  I believe that occurred October 3rd.

1    Q.  Of the previous year?

2    A.  2014.

3    Q.  And have you had an opportunity to speak with one of the

4    Homeland Security agents involved with that, Aaron

5    McClellan?

6    A.  Yes.

7    Q.  And have you reviewed some other information?

8    A.  I believe it was a log sheet that was completed by the

9    forensic examiner.

10              MS. PROVINZINO:  May I approach, Your Honor?

11              THE COURT:  You may.

12   BY MS. PROVINZINO:

13   Q.  Special Agent Lang, I'm handing you what has been

14   premarked for identification purposes as Government Exhibit

15   6.

16   A.  Yes.

17   Q.  And what is this document?

18   A.  This I would call an acquisition log.  It just details

19   the hardware that was submitted for examination, and the

20   basic specifications of it, and the result of acquisition.

21   Q.  And this was provided to you recently by Special Agent

22   McClellan; is that correct?

23   A.  Yes.

24   Q.  And is it in the same, or substantially the same,

25   condition as when you received it?

1    A.  Yes.

2                MS. PROVINZINO:  The government moves admission of

3    Government Exhibit 6.

4                MR. WOLD:  No objection.

5                THE COURT:  Exhibit 6 is admitted.

6    BY MS. PROVINZINO:

7    Q.  Now, through the information that you've obtained from

8    Homeland Security in Los Angeles, when did they obtain the

9    laptop?

10   A.  It was on October 3rd.

11   Q.  And what was the occasion to get the laptop?

12   A.  I believe it was a secondary examination at the Los

13   Angeles Airport.

14   Q.  And when they obtained it, what did they do with it?

15   A.  I believe there was a preview conducted at the airport

16   by, I believe it was, McClellan.

17   Q.  And then at that point in time, what did they decide

18   they were going to do with it?

19   A.  They found several images of child pornography, so they

20   did determine they were going to seize the laptop.

21   Q.  So did they in fact then seize it and put it in the

22   property room?

23   A.  Yes.

24   Q.  And then similar to the process here, did they then

25   image that laptop?

1    A.   The imaging started the next day.

2    Q.   And that was?

3    A.   October 4th.  Yes.

4    Q.   And October 3rd, as I understand, was a Friday.  Is that

5    correct?

6    A.   Yes.

7    Q.   So the imaging began on that Saturday, October 4th?

8    A.   Yes.

9    Q.   And then when did it come back to the case agent,

10   Special Agent McClellan?

11   A.   Special Agent McClellan said he started a preview on

12   that Monday, the following Monday.

13   Q.   And when you talk about a "preview," what did he do with

14   it?

15   A.   A preview or a case agent review of the data.  So he was

16   working off the working copy that was made by the forensic

17   agent, and he started an examination.

18   Q.   Did he use any forensic tools for his review?

19   A.   I believe he stated he used IEF as one of the tools.

20   Q.   And that's Internet Evidence Finder?

21   A.   Internet Evidence Finder.

22   Q.   And that's similar to the tool you used?

23   A.   Same tool, yes.

24   Q.   And you talked about that there were in fact some images

25   and videos found that were consistent with child

1    pornography; is that correct?

2    A.  Yes.

3    Q.  And where were those images located?

4    A.  It was found in the user profile several folders down as

5    listed on here, on the log.

6    Q.  And are you referring to the actions comments on the

7    last --

8    A.  Last line, "users/QQQQ/Videos/DVXmovies."

9    Q.  So that's where the child pornography was found?

10   A.  Yes.

11   Q.  So would that be considered active or inactive space?

12   A.  Active, from my understanding.

13   Q.  And you understand that Special Agent McClellan and

14   others had an opportunity to interview Mr. Smasal at the

15   airport; is that correct?

16   A.  Yes.

17   Q.  And was the finding of those child-pornography images

18   and videos consistent with the information Mr. Smasal had

19   given them?

20   A.  Yes.

21   Q.  And after the case agent conducted the review -- you

22   said he started on that Monday?

23   A.  That Monday, yes.

24   Q.  And how long did you understand his review to take?

25   A.  He stated that he finished his exam on Wednesday.

1    Q.  Did he do then any further search after that Wednesday?

2    A.  No.

3    Q.  And where is that computer currently located?

4    A.  Still located at the Los Angeles office.

5          MS. PROVINZINO:  No further questions.  Oh, the

6    government moves for Government Exhibit 6.  I'm not certain

7    that I had done that.  I did, actually, didn't I.

8          THE COURT:  Yes.  Thank you, Counsel.

9          Mr. Wold.

10         MR. WOLD:  No questions.

11         THE COURT:  All right.  Thank you.

12         Any other witnesses or evidence to be presented?

13         MS. PROVINZINO:  No, Your Honor.

14         THE COURT:  All right.  Well, then I'll ask for

15   arguments.  Since this is defendant's motion, do you wish to

16   make any argument in support of your suppression motions?

17         MR. WOLD:  Your Honor, we would appreciate the

18   opportunity to submit written arguments to you, please.

19         THE COURT:  All right.  And the government's

20   response?

21         MS. PROVINZINO:  I would prepare a response at

22   whatever time frame the Court directs.  I would imagine it

23   should be -- should we order the transcript here today?

24         MR. MORRISON:  I would like a transcript.  We're

25   going to want it anyway.  If we could wait to have a

1      transcript, it would be helpful.

2              THE COURT:  All right.  I don't know the

3      turn-around on a transcript.

4              (A brief discussion was held off the record.)

5              THE COURT:  All right.  It looks like we can get a

6      transcript out and stick to a briefing schedule that would

7      require the defendant to have his brief in by May 13th and

8      the government's response by May 20th, and then we'll get

9      the R&R out.

10             Before we go into recess, though, I do have some

11     questions for counsel based upon the submissions that I

12     have, because we're not going to have another opportunity to

13     have a hearing.  I'll get your papers in.  So let me begin

14     with Mr. Wold and ask you a few questions about the

15     reasonable suspicion and the standard that would be applied

16     in a border search.

17             MR. MORRISON:  Your Honor, I'll address it, if you

18     don't mind, the legal issues.

19             THE COURT:  All right.

20             MR. MORRISON:  Basically, my understanding is --

21     and you see from our initial submissions we're relying on

22     the *Cotterman* case -- is that at the border we don't have

23     the same Fourth Amendment expectations of privacy that we

24     have anywhere else in our life.  And the courts have

25     concluded that a laptop is like a book and so at least at

1    the border you travel with your laptop, agents don't have to

2    have any reason to open it up, take a cursory look at the

3    laptop.  Assuming nothing is found, then I think that's when

4    the reasonable suspicion comes in to require the additional

5    more in-depth search.  Quite frankly, there's not a lot of

6    case law that I could find on this issue.

7          I guess the argument that we will be making is the

8    CBP or the border patrol agents who would typically do this

9    in their normal course of business could have opened up

10   Mr. Smasal's computers and taken a look at them.  And if

11   they would have found even a hint of contraband, criminal

12   activity going on, that would meet their reasonable

13   suspicion requirement to extend that search into a forensic

14   search.  I don't think I would have an argument there.

15         Here the argument that I believe I will be making

16   to the Court after I review the transcript and some more of

17   the law will be that there was never an actual border

18   preview as contemplated by border searches.  These were --

19   both the search in LA and the search in Minneapolis were set

20   up ahead of time by Homeland Security.  They had basically

21   jumped the gun.  This wasn't the typical search.  And my

22   argument is, first, that the information that the agents

23   had, especially in the Minneapolis search, didn't rise to

24   the level of reasonable suspicion.  They had no evidence

25   that Mr. Smasal was traveling to the Philippines where these

1    chats had been occurring and where the alleged victims

2    resided.  And given the time distance between when the chats

3    occurred -- much of them occurring in August I believe that

4    Exhibit 1 will show -- that there is too much expiration of

5    time between August and the seizure in February.  So there's

6    that expiration of the reasonable suspicion.

7         And the initial looking at the computer that the

8    agent talked about, while that may have been a normal border

9    patrol search that would have been acceptable, in this case

10   it's not because it was just a pretextual search.  I mean,

11   it wasn't a routine border inspection.  This was an

12   orchestrated search under the guise of a border search.

13        So I will be making both of those arguments.  I

14   hope that answers or at least gives the Court some guidance.

15        THE COURT:  So do you have any Eighth Circuit case

16   law that the Eighth Circuit has adopted this reasonable

17   suspicion standard at all with computer searches at the

18   border?

19        MR. MORRISON:  I did not find one.  Certainly I'll

20   do a little more exhaustive search in the second go-round,

21   but I did not find one in my initial search.

22        THE COURT:  Why is there a distinction between

23   what happens with a manual search and a search that would be

24   aided by software?

25        MR. MORRISON:  I think, at least from the other

1    circuits that I read on the issue, what it goes into is that

2    just as you go to the border and an agent just out of whim

3    can't ask you to strip down and have a full-body cavity

4    search, there has to be an additional level of suspicion

5    before a border patrol agent can request that, the same

6    holds true for things like your phones and things like your

7    computer.  Even though it is a border, we do have still some

8    amount of Fourth Amendment expectation of privacy.  And the

9    courts have said we have to balance between national

10   security interests, between importation, exportation, things

11   like that.  We have to control our borders.  But at the same

12   time, it's not a blank check for the government to do

13   anything they want as far as intrusion.  They can't just

14   take your diary and read every page of it because they're

15   interested.  There has to be that level of reasonable

16   suspicion if when they open it up all they see is writing.

17   And that extends to a laptop.  That extends to a cell phone.

18   Where it may used to be our letters were our most intimate

19   and private forms of communication, now with e-mail, text

20   messaging, that becomes our most intimate form of

21   communication, and the courts are recognizing that you can't

22   just give the border a blank check to look at everything

23   they want whenever they want.  There are different levels.

24   And if on first blush there's not signs of criminal

25   activity, then continuing that search deeper goes too far.

1    And so I think that's why the circuits that have addressed

2    it, mostly in the Ninth Circuit it appears, have talked

3    about that extra level of intrusion into privacy, and that's

4    what requires the reasonable suspicion.

5            I will admit, as I conceded in our initial moving

6    papers, it's an extremely low burden that the government

7    has.  Nevertheless, it is a burden that the government must

8    show.

9            THE COURT:  Thank you, Counsel.

10           Ms. Provinzino, if you'd like to respond to those

11   same questions.

12           MS. PROVINZINO:  Well, and I think defense counsel

13   just did answer that to some extent.  My understanding is

14   it's a totality-of-the-circumstances evaluation if we even

15   look to the reasonable suspicion.  But it's deemed, at least

16   through *Cotterman*, to be a modest, workable standard.

17           I think there are two ways this Court can kind of

18   evaluate things, and we'd urge that there really aren't the

19   kind of Fourth Amendment protections at an international

20   border.  It's a different situation.  We're dealing with

21   lots of cargo, lots of people, things moving, and decisions

22   need to be made in a pretty timely basis.  I think all of

23   the testimony the Court heard today reflects that, that

24   there was evidence of somebody who had previously entered

25   the country within the past six months who had imported

1    child pornography and who had been engaged in chats seeking

2    out under-age children for sexual activity as provided

3    through NCMEC tips I would say would be more than sufficient

4    for any kind of reasonable suspicion.  All of that was

5    known, including you heard the Special Agent talk about the

6    defendant's extensive travel history all across Asia, but

7    particularly in Taiwan and the Philippines.

8              So I think the first step would be to look at the

9    fact that -- I think this Court addressed the issue; really

10   as the facts of this case bear out, there isn't much of an

11   appreciable difference between the manual review that

12   happened in those 40 minutes at the Minneapolis-St. Paul

13   Airport and then what later happened through the forensic

14   examination.

15             THE COURT:  And how do you define "forensic

16   review" for purposes of an analysis of this issue?

17             MS. PROVINZINO:  That's a difficult question.  I

18   think in this case a forensic review would be something that

19   is assisted by a particular software.  All that software

20   did, as you heard described -- the X-Ways or the use of

21   Internet Evidence Finder -- is effectively organize and

22   parse out the information.

23             THE COURT:  It's not limited to looking for

24   deleted data, forensic?

25             MS. PROVINZINO:  No.  A forensic search typically

1       does encompass looking for deleted data.

2               THE COURT:  It's not limited to?

3               MS. PROVINZINO:  It's not limited to that.  And I

4       believe the evidence today indicated that nothing of any

5       evidentiary value was obtained from anything in deleted

6       data.

7               THE COURT:  Are you aware of any Eighth Circuit

8       decisions that look at whether a border search of a computer

9       or cell phone would require reasonable suspicion before you

10      dive into the forensic analysis?

11              MS. PROVINZINO:  Nothing that I am aware of, Your

12      Honor.  The only case, the *Cotterman* case, which was raised

13      by the defendant in the Ninth Circuit, is an outlier en

14      banc.  There are other Ninth Circuit cases, including

15      *Arnold*, that don't go there.  And then there are -- the

16      *Ickes* case would be one that I cited in the Fourth Circuit

17      and others that indicate border searches are something very

18      unique and because of that, the government has the authority

19      and ability to do more than what they would need through

20      other types of searches.

21              I think the only outlier which was cited was a

22      Supreme Court case, which was very physically intrusive and

23      that was an examination of somebody's alimentary canal.  I

24      would submit that this type of search, the 40 minutes within

25      the airport, of the manual review, and then the later use of

 1    several commercially-available forensic software tools do

 2    not get anywhere close to that type of physical intrusion.

 3              THE COURT:  Thank you.

 4              Counsel for the defendant, anything further to

 5    add?

 6              MR. MORRISON:  No, Your Honor.

 7              THE COURT:  All right.  Thank you.  That was

 8    helpful, and I appreciate counsels' arguments.

 9              Is there anything else we need to cover here today

10    from the defendant?

11              (A brief discussion was held off the record.)

12              MR. WOLD:  One.  I just want to verify the LA

13    statement.  We've made a motion for suppression.  No

14    evidence was placed on it.  The government has indicated

15    they won't use it, so we would ask that that be suppressed

16    by the Court.

17              Secondly, on an unrelated topic, Mr. Smasal has

18    been having ongoing issues at Sherburne County with

19    medication.  Particularly, he has an affliction to which

20    testosterone has been prescribed.

21              Could you give me the name of that.

22              THE DEFENDANT:  Klinefelter's syndrome.

23              MR. WOLD:  Klinefelter's syndrome is the

24    affliction.  It's been an issue we've attempted to resolve.

25    It's still unresolved, Your Honor.

1          An alternative, and I think there was basis from

2     the pretrial officer, that if Mr. Smasal was in a halfway

3     house we could accomplish the appropriate medication.  We

4     would ask the Court to reconsider that detention order or at

5     least provide direction to the marshals to see that that

6     affliction is addressed and that his medication is provided

7     to him.

8          THE COURT:  Well, I would request that defense

9     counsel submit a letter copying the government on what

10    medication is required so that the proper inquiry can be

11    made.  At this time I won't be considering detention.  If

12    there is a need to revisit detention based upon the statute

13    for reviewing that with anything new, you know, that is

14    available.  But I'll look into -- if the medication isn't

15    being provided, I will do some follow-up if you send me a

16    letter.

17         MR. WOLD:  Thank you.

18         THE COURT:  I do have a couple of dates that you

19    may already have, but let's make sure that everybody is on

20    the same page.  I have an August 10th date for voir dire and

21    jury instructions, and then a trial date for August 17th at

22    9:00 a.m. before Judge Tunheim in Courtroom 13E.  An order

23    will be coming out.  I'll take a look at the discovery

24    motions and we'll get an order out that includes a decision

25    on those motions and these dates.  And then I look forward

1     to getting the opening brief on the suppression issues and

2     the response, and then a decision will follow.

3              Anything else to cover today, counsel?

4              MS. PROVINZINO:  Nothing further from the

5     government, Your Honor.

6              THE COURT:  Thank you.

7              MR. WOLD:  Nor from the defense, Your Honor.

8     Thank you.

9              THE COURT:  Thank you very much.  We are in

10    recess, and the defendant is remanded to the custody of the

11    United States Marshal.

12              (Court adjourned at 11:20 a.m.)

13                        *      *      *

14

15

16         I, Debra Beauvais, certify that the foregoing is a

17    correct transcript from the record of proceedings in the

18    above-entitled matter.

19

20

21              Certified by:   s/Debra Beauvais
                                Debra Beauvais, RPR-CRR
22

23

24

25